# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SHARON L. MILLER,                                    CIVIL NO. 12-1308 (PJS/TNL)

        PLAINTIFF,

V.                                                   **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

        DEFENDANT.

---

      Lionel H. Peabody, Peabody Law Office, PO Box 10, Duluth, MN, 55801 for Plaintiff; and

      Gregory G. Brooker, Assistant United States Attorney, 600 United States Courthouse, 300 S. 4th Street, Minneapolis, Minnesota 55415, for Defendant.

## I.  INTRODUCTION

Plaintiff Sharon L. Miller brings the present action, disputing Defendant Commissioner of Social Security's denial of her application for supplemental security income ("SSI"). This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the parties' cross motions for summary judgment. For the reasons set forth herein, this Court will recommend Plaintiff's Motion for Summary Judgment (Docket No. 12) be denied, and the Commissioner's Motion for Summary Judgment (Docket No. 15) be granted.

## II.    FACTS

### A. Procedural History

Plaintiff filed for SSI on October 24, 2008, alleging disability beginning January 1, 2006, due to depression, posttraumatic stress disorder ("PTSD"), and a bad back. (R. 248.) Plaintiff's claim was denied initially (R. 86-89) and on reconsideration. (R. 96-98.) Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 99-101.) On May 11, 2011, Plaintiff, with counsel, had a hearing before ALJ Ben Barnett. (R. 27.)

In his May 23, 2011 opinion (R. 6-26), the ALJ concluded as follows: Plaintiff has not engaged in substantial gainful activity since October 24, 2008. (R. 11.) Plaintiff suffered from a herniated disc at L5-S1, major and severe depressive disorder with psychotic episodes, borderline personality disorder, obesity, and frequent headaches. (R. 11.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04 or 12.06. (R. 11.) Plaintiff had the residual capacity to

> perform light work as defined in 20 C.F.R. 416.967(b) except she can only occasionally climb ramps and stairs, occasionally climb ladders, ropes and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and she is limited to simple routine, repetitive tasks, and limited to brief and superficial contact with the public and co-workers.

(R. 13.) Plaintiff was unable to perform any past relevant work, but considering her age, education, work experience, and residual functional capacity, Plaintiff could perform all or substantially all of the requirements of unskilled light occupations such as garment

folder, hand packager, and cleaner. (R. 18-19.) These are all jobs that exist in significant numbers in the national economy. (R. 18-19.) The ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act since she filed her application on October 24, 2008. (R. 19.)

Plaintiff requested review of the ALJ's decision, and the Appeals Council denied the request. (R. 1-4.)

### B. Employment Background

Plaintiff worked as a waitress at Diamond A Restaurant in Eagle Butte, South Dakota for a few months in 1995. (R. 379.) For a week in 1996, she trained to be a telemarketer for Teleresources in Superior, Wisconsin. (R. 379.) Plaintiff then worked for Taco Johns in Eagle Butte, South Dakota for a few months in 1998. (R. 379.) From January to July 1999, Plaintiff worked as a cage cashier for Fond du Luth Casino in Duluth, Minnesota. (R. 379.) She worked in telemarketing for a few weeks in 2001, then returned to Fond du Luth Casino as a concessions stand worker for a few months beginning in October 2001 and as a bingo utility worker for a few months beginning in February 2002. (R. 379.) She last worked for Duluth Workforce Center in a secretarial position for about a month in 2002. (R. 379.)

### C. Medical Records

In December 2005, psychologist Susan Hall diagnosed Plaintiff with major depressive disorder, dysthymia, and PTSD. (R. 659.) Ms. Hall gave Plaintiff a Global

Assessment of Functioning ("GAF")[1] of 50. (R. 659.) On January 16, 2006, Plaintiff presented at the emergency room at St. Mary's Medical Center in Duluth, Minnesota, complaining of back pain. (R. 565.) Physical examination showed no vertebral tenderness, numbness, or weakness. (R. 565-566.) The treating physician followed Plaintiff's primary care provider's guidance and did not prescribe any narcotic medication. (R. 566.) When she was discharged, Plaintiff "had no difficulty getting up from the bed." (R. 566.)

Plaintiff visited the emergency room at St. Mary's again on February 1, 2006, complaining of back pain. (R. 564.) Plaintiff showed no accompanying injury, weakness, numbness or tingling. (R. 564.) The doctors instructed Plaintiff to use Tylenol or ibuprofen to manage any future pain. (R. 564.) Plaintiff was discharged in stable condition. (R. 564.)

Plaintiff again met with Susan Hall on March 10, 2006. (R. 649-50.) Plaintiff reported that she had recently ended an abusive relationship and was "feeling very depressed." (R. 649.) She also reported that her lower back pain caused her to go to the emergency room about once a week. (R. 649.) On March 23, 2006, Plaintiff reported that she was continuing to have panic attacks. (R. 682.) She was continuing her Methadone program, using marijuana daily, and laying around in her apartment with her curtains

---

[1] GAF represents "the clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders 30-32 (4th Ed. 1994). A patient's GAF is scored between 0 and 100; 10 represents "persistent danger of severely hurting self or others," and 100 represents "superior functioning in a wide range of activities." A score of 35 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life." *E.g., Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

closed a lot of the time. (R. 682.) Ms. Hall determined that Plaintiff's GAF score was 35. (R. 649-50.)

On May 23, 2006, Plaintiff arrived at the emergency room at St. Luke's complaining of lower back pain, nausea, vomiting, and dehydration. (R. 605.) She reported that she had been unable to hold down her methadone, which caused her back pain to flare up. (R. 605.) Plaintiff was discharged in stable condition. (R. 606.)

Plaintiff saw Ms. Hall on August 23, 2006. (R. 676.) Plaintiff reported that she was having anxiety attacks about twice a week, and had been feeling sad and crying a lot. (R. 676.) On August 30, 2006, Plaintiff and Ms. Hall discussed, created and signed a treatment plan. (R. 675.) Plaintiff reported at this time that she had been having Braxton-Hicks contractions and was using marijuana to manage her nausea and discomfort. (R. 675.)

On September 7, 2006, Plaintiff underwent a full psychiatric evaluation by Dr. Steven Sutherland, M.D. (R. 647-48.) Plaintiff reported daily dysphoria and mild feelings of hopelessness, difficulty sleeping associated with anxiety, and daily marijuana use to control persistent nausea. (R. 647.) Plaintiff was organized and logical, tearful when appropriate, and demonstrated no overt psychotic symptoms. (R. 648.) Dr. Sutherland's assessment of Plaintiff was that she had major depressive disorder (recurrent, moderate), PTSD, dysthymia, opioid dependence (methadone), cannabis dependence (active), and nicotine dependence (active). (R. 648.) Dr. Sutherland assessed Plaintiff's GAF to be 45. (R. 647-48.)

Plaintiff visited the emergency room again on January 19, 2007, complaining of back pain. (R. 559.) She reported intense pain around the lumbosacral junction radiating down her left posterior thigh. (R. 551, 559.) She was frequently changing position, unable to find a comfortable position. (R. 559.) Plaintiff complained of severe pain, but exhibited no numbness, tingling, or muscle weakness. (R. 559.) An MRI showed mild degenerative disc disease, but no significant changes from 2006. (R. 548-59, 554, 556.) She had a mild disc bulge at L5-S1, left greater than right neural foraminal narrowing, and no apparent impingement on the exiting nerve roots. (R. 554.) Plaintiff was discharged the next day. (R. 548-49.) On February 15, 2007, Plaintiff visited the emergency room after having found her boyfriend dead on the couch. (R. 601-02.) She was diagnosed with an acute grief reaction. (R. 602.) Two days later, she returned to the emergency room exhibiting symptoms of a panic attack. (R. 794-95.)

On May 11, 2007, W. Shipley, Ph.D., reviewed Plaintiff's medical record and completed a Psychiatric Review Technique Form. (R. 698-711.) Dr. Shipley noted that Plaintiff had been diagnosed with major depressive disorder, PTSD, and opiate dependency. (R. 710.) Dr. Shipley opined that Plaintiff had a mild restriction of activities in daily life; mild difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no extended episodes of decompensation. (R. 708.) Dr. Shipley also noted that Plaintiff's attention, concentration and cognition were intact, and that she was able to perform many tasks without difficulty, including caring for her children, focusing on TV shows, talking to friends, using public transportation, cooking, doing laundry, shopping, paying bills, and managing her own

finances. (R. 710.) Dr. Shipley opined that Plaintiff's pace appeared to be within normal limits and she had the cognitive abilities and concentration necessary to complete tasks. (R. 710.) Dr. Shipley also opined that Plaintiff could make work-related decisions, remember locations and work-like procedures, and maintain a schedule. (R. 710.)

Plaintiff visited the emergency room on June 22, 2007, complaining of lower back pain radiating down her right leg. (R. 791-92.) The treating physician noted that plaintiff "was actually lying fairly comfortable until . . . she saw me enter the room and then she moaned and complained of discomfort." (R. 792.) Plaintiff was discharged with instructions to follow up with her primary care physician and a prescription for Flexeril. (R. 792.)

Plaintiff saw her primary care physician, Lorraine Turner, M.D., on January 7, 2008. (R. 411-14.) Dr. Turner noted that Plaintiff reported feeling sad, stressed, hopeless and overwhelmed, and had little motivation. (R. 411.) Dr. Turner's psychiatric/emotional review found Plaintiff positively exhibiting anxiety, fear, depression, and irritability, and reporting auditory hallucinations. (R. 412.) Dr. Turner noted that Plaintiff had a depressed affect and was anxious. (R. 413.) Despite some lumbar spine tenderness and moderate pain with motion, Plaintiff displayed normal mobility. (R. 413.) Plaintiff's chemical dependency was improving. (R. 411.)

Plaintiff visited Dr. Steven Sutherland on January 17, 2008. (R. 730.) Dr. Sutherland noted that Plaintiff was reporting auditory hallucinations; the examination found "[n]o auditory or visual hallucinations [and] no overt psychotic symptoms." (R. 730.) Plaintiff was alert and oriented, spoke clearly at a normal pace and volume, and

displayed organized, logical thought processes. (R. 730.) Dr. Sutherland added Risperdal to Plaintiff's medical regimen to address her mental health problems. (R. 730.) Plaintiff returned on January 25, reporting that she was still hearing voices and possibly seeing dead people. (R. 729.) She was oriented and able to concentrate, but displayed a poor memory and a depressed affect. (R. 729.) Plaintiff's Buspar was restarted, her Cymbalta was decreased, and she was prescribed Wellbutrin. (R. 729.)

Plaintiff called Dr. Turner on January 28, 2008, seeking a supervised weight-loss opportunity; at this time, she weighed about 259 pounds. (R. 416, 417.) Plaintiff met with Jennifer Hall, RD, LD, for nutritional therapy on February 4, 2008. (R. 417.) She reported to Ms. Hall that she had difficulty with physical activity due to back pain and depression; she also reported that her depression had gotten better after a recent change in her medication. (R. 417.) Plaintiff proceeded to meet with Ms. Hall eight times between February 4, 2008, and June 15, 2009. (R. 417-18, 421, 427, 428-29, 485, 486-87, 488-89, 490-91.)

On March 11, 2008, Plaintiff reported impaired concentration and memory, panic attacks, auditory hallucinations and severe anxiety at a psychiatry follow-up. (R. 728.) She stated that her medications were "not right;" after review of her medication regimen, it was discovered that she was not taking her medications regularly. (R. 728.) On March 18, 2008, Plaintiff reported to her gynecologist that she was anxious. (R. 424.) On April 7, 2008, Plaintiff reported to Ms. Hall that her physical activity had increased; she was in pain after walking with her children for an hour and a half. (R. 427.) She also set a goal with Ms. Hall of five minutes of physical activity every day. (R. 427.)

On April 21, 2008, Plaintiff reported improved concentration and a decrease in both depression and anxiety. (R. 726.) On May 5, 2008, Plaintiff reported increased physical activity to Ms. Hall, including walking her son to school two days a week, walking to the grocery store, and walking to her appointment. (R. 428.) On May 20, 2008, Plaintiff again reported an improvement in her depression and anxiety. (R. 725.) She exhibited intact orientation, clear speech, better concentration, a neutral/anxious affect, and organized thoughts. (R. 725.) She still complained of fatigue and headaches. (R. 725.)

Plaintiff reported on July 8, 2008, that her depression had been more stable. (R. 432.) She had daily headaches that would go away after a few hours. (R. 432.) Plaintiff reported that she still suffered back pain and treated it with ibuprofen. (R. 434.) A physical examination showed no cervical or thoracic spine tenderness and normal mobility, and her lumbar spine showed muscle spasm and mild pain with motion. (R. 434.) Plaintiff also displayed no unusual anxiety or evidence of depression. (R. 434.)

On July 22, 2008, Plaintiff underwent a psychological evaluation by Anita Schlank, Ph.D. (R. 440-46.) In the course of this evaluation, Dr. Schlank reviewed Plaintiff's background. (R. 440-41.) Plaintiff initially appeared less than alert, but "her alertness improved throughout the evaluation." (R. 441.) During the interview, Plaintiff stated that her anxiety attacks were under control since she started taking Buspar. (R. 442.) She stated that she was staying in bed all the time, but was also able to take her children to the park. (R. 442.) Plaintiff also stated that she has problems with concentration and memory, and Dr. Schlank noted that Plaintiff exhibited attentional

deficit in a neuropsychological screening test. (R. 442, 444.) Dr. Schlank opined that Plaintiff's attentional deficit was likely related to Plaintiff's methadone dosage. (R. 445.) Plaintiff demonstrated an average IQ of 94. (R. 443.) Dr. Schlank opined that Plaintiff's responses to a questionnaire assessing various psychiatric symptoms "were of questionable validity due to what appeared to be an exaggeration of her problems." (R. 444.) Dr. Schlank also opined that Plaintiff's symptoms of fatigue, disturbed sleep and appetite, andehonia, and mood-congruent hallucinations "cause clinically significant distress and interfere with her social and occupational functioning." (R. 444.) Dr. Schlank assessed Plaintiff's GAF to be 45 and recommended that,

> [g]iven the severity of [Plaintiff's] depressive symptoms, and the significant side effects she is experiencing from her high level of methadone maintenance, it does not appear likely that she could currently maintain full-time employment. It is recommended that she be assisted with the application process for obtaining disability insurance.

(R. 444, 445-46.)

Plaintiff met with Dr. Turner again on August 11, 2008. (R. 436-39.) During this visit, Plaintiff reported that she was not anxious, fearful or irritable. (R. 438.) She was focused, denied any memory loss, hallucinations and mood swings, but stated that she had depressed moods. (R. 438.) Dr. Turner noted that Plaintiff had a normal attention span and concentration, and did not have pressured speech or flight of ideas. (R. 438.)

Plaintiff underwent a functional assessment at the Human Development Center on September 22, 2008. (R. 731.) This assessment noted that Plaintiff struggled with symptoms of depression including, but not limited to, "lack of focus, sleep pattern

interruption, anxiety, low motivation, and lack of hope." (R. 733.) The assessment also stated that Plaintiff "has difficult remembering appointments and very often forgets to attend them." (R. 733.) On October 8, 2008, Plaintiff reported that she was "doing pretty good" and that her depression was stabilizing. (R. 724.) Her speech was clear and she displayed organized thoughts, concentration, memory and judgment. (R. 724.) On November 3, 2008, Plaintiff reported that her anxiety was "not as bad," her sleep was improved, and she was "doing a little better." (R. 723.)

On March 9, 2009, Melissa Strey, MHP, completed another functional assessment of Plaintiff. (R. 501-505.) Ms. Strey determined that Plaintiff was experiencing moderate problems with mental health, use of drugs and alcohol, vocational functioning, educational functioning, social functioning, interpersonal skills, and self care. (Tr. 502.) Plaintiff reported that she was in overall good health, managed her finances, used the bus for transportation, and was beginning to get her home more organized. (R. 503.) On March 16, 2009, Ms. Hall noted that Plaintiff remained interested in weight-loss surgery. (R. 485.) Plaintiff continued to work on lifestyle changes and proper meal planning, and on April 20, 2009, Plaintiff weighed 228 pounds. (R. 486.)

On April 21, 2009, Plaintiff underwent a psychological evaluation by Robert W. Hoffman, Ph.D. (R. 447.) Dr. Hoffman reviewed Plaintiff's medical record, noting evidence of panic attacks, obsessive-compulsive symptoms, and PTSD, "none of the symptoms rising to the level of clinical diagnosis." (R. 447.) Plaintiff reported that she had been depressed a majority of the time and just recently began leaving her home, and that her anxiety was under control thanks to medication and her own conscious efforts.

(R. 447-48.) Her anxiety attacks were occurring about once every two weeks for fifteen minutes at a time. (R. 448.) Dr. Hoffman opined that Plaintiff "would tolerate little stress in an entry-level workplace. She would probably respond satisfactorily to co-workers and supervisors unless very depressed." (R. 449.) Dr. Hoffman also opined that Plaintiff "carries out a limited number of tasks with mild persistence at an intermittent pace" and "can concentrate on and understand ordinary instructions." (R. 449.) Dr. Hoffman determined Plaintiff's GAF to be 43. (R. 449.)

On April 24, 2009, Plaintiff reported continued improvement to Dr. Sutherland. (R. 500.) Plaintiff reported poor sleep regulation and low motivation, and she denied any recent medical problems. (R. 500.) Plaintiff was alert and oriented, her speech was clear, and her thought process was organized and logical. (R. 500.) Plaintiff discussed adjusting her medication regimen with Dr. Sutherland, and stated that she was now running. (R. 500.) On May 18, 2009, Plaintiff weighed 220 pounds. (R. 488.) In a meeting with Dr. Turner, Plaintiff reported an increase in activity around the house, including stretching and weights, walking outdoors, and playing in the park with her son. (R. 488.)

On June 1, 2009, Thomas Kuhlman, Ph.D., reviewed Plaintiff's records from October 24, 2008 to June 1, 2009, and completed a Psychiatric Review Technique Form. (R. 455-68.) Dr. Kuhlman assessed Plaintiff with an affective disorder, anxiety-related disorder, and substance addiction. (R. 455.) Dr. Kuhlman opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace; moderate restriction of activities of daily living; and mild difficulties in maintaining social

functioning. (R. 465.) The psychological panelist working with Dr. Kuhlman thought Plaintiff's depression was mild rather than severe. (R. 467.) He noted that Plaintiff remained depressed but that she was able to tend to the needs of her children. (R. 467.) During the evaluation, "[Plaintiff] also noted that ongoing mental health treatment (medications and therapy) was helping her" and that "medications were also helping with her anxiety." (R. 467.) Dr. Kuhlman opined that Plaintiff had the ability to handle the stress and pressure of and the mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions with adequate persistence and pace, that she could adequately handle brief and superficial co-worker and public contact. (R. 479.) Dr. Kuhlman specifically noted, "If she remains treatment compliant and sober/abstinent she should be capable of doing routine repetitive task work" within 12 months, if not before. (R. 467.)

Plaintiff met with Dr. Turner again on July 8, 2009. (R. 494-97.) Plaintiff presented with a normal affect. (R. 496.) She was not anxious, and her depression was improving. (R. 494, 496.) Plaintiff reported that she had headaches "all the time" and severe headaches or migraines once or twice a week. (R. 494.) Plaintiff reported that she had been doing a lot of walking and had lost 61 pounds in the last year. (R. 494.) Dr. Turner noted that Plaintiff had a muscle spasm and mild pain in her lumbar spine with motion, full range of motion in her hips, and her left knee was tender anteriorly and exhibited mild pain with motion. (R. 496-97.)

On August 31, 2009, Joseph Cools, Ph.D., reviewed Plaintiff's record and completed a Psychiatric Review Technique form. (R. 518-31.) Dr. Cools opined that

Plaintiff had a depressive disorder and a panic disorder. (R. 521, 523.) Dr. Cools noted that Cymbalta helped with Plaintiff's anxiety attacks and that Plaintiff frequently walked at night. (R. 530.) Dr. Cools opined that Plaintiff had moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and mild restriction of activities of daily living. (R. 528.) Dr. Cool also noted that although Plaintiff did not meet/equal any listing, there were some functional impairments. (R. 530.) In his functional capacity assessment, Dr. Cools opined that Plaintiff "would be able to learn 3-4 step tasks" and "to concentrate sufficient to perform most simple routine tasks on a sustained basis . . . . under ordinary stress in a work-like setting." (R. 534.)

On September 21, 2009, Plaintiff was seen by Franklin Johnson, M.D. (R. 540-43.) Physical examination revealed Plaintiff weighed 184 pounds. (R. 541.) Plaintiff was alert, did not appear in discomfort, weepy or depressed, could move without difficulty, and had excellent balance. (R. 541.) Dr. Johnson's impression was that Plaintiff did not have the motivation to enter the work force. (R. 541.) He noted, "It would appear quite necessary for some major upset in her lifestyle to seek employment, even though her incapacitation would appear to be of minimal nature other than the subjective complaints of depression." (R. 541.) X-rays revealed moderate narrowing of disc spaces at L4-5 and L5-S1 and Dr. Johnson concluded Plaintiff suffered from degenerative disc disease. (R. 542.)

Plaintiff was treated at the emergency room on September 26, 2009, for abdominal pain resulting from being kicked. (R. 829-30.) On September 28, 2009, she returned to

the emergency room exhibiting symptoms of opiate withdrawal because she could not keep her methadone prescription down. (R. 827-28.) On both occasions, medical staff administered appropriate medication and Plaintiff was discharged in good condition. (R. 827-28, 829-30.)

On April 27, 2010, Plaintiff's psychotherapist Michelle Gordon, LICSW, LMFT, completed a form assessing Plaintiff's impairments to be used to determine if she was eligible for cash assistance or the Food Support Employment and Training program. (R. 756.) Ms. Gordon opined that Plaintiff suffered from recurrent major depressive disorder, a bad back and a bad knee. (R. 756.) Ms. Gordon prescribed a treatment plan and opined that Plaintiff would not be able to perform any employment in the foreseeable future. (R. 756.)

On July 31, 2010, Plaintiff was hospitalized after having suicidal thoughts. (R. 813-825.) Plaintiff's assessment was acute suicidal ideation, major depression, and domestic abuse, and she was admitted on a 72-hour hold. (R. 814.) During this hospitalization, Plaintiff was diagnosed with dysthymic disorder, PTSD, opioid dependence, and cannabis abuse. (R. 818.) Her GAF was determined to be 35 at admission (R. 818) and 45 at discharge (R. 813-14). She was discharged against medical advice on August 4, 2010. (R. 814.)

Plaintiff visited the emergency room four more times between August 9 and November 2, 2010. (R. 782-83, 779-80, 806-07, 808-12.) On August 9 she presented complaining of a headache and low-grade fever (R. 782); on October 4 she presented with a headache and flu-like symptoms (R. 779-80); on November 1 she presented with

significant swelling around her left eye and nasal fracture following an assault from her boyfriend (R. 808-09); and on November 2 she returned complaining of headache, facial pain and nausea (R. 806).

Plaintiff saw Dr. Turner on October 26, 2010, complaining of lower back pain. (R. 883.) She complained of weekly migraines and daily panic attacks. (R. 883.) Upon examination, her cervical spine had muscle spasm and a mildly reduced range of motion; thoracic spine had tenderness and moderate pain with motion; and lumbar spine had muscle spasm and severe pain with motion. (R. 885.) Plaintiff saw Dr. Turner again on November 9, 2010, for a pre-operative evaluation regarding her nasal fracture. (R. 892.) Plaintiff complained of headaches and reported being more depressed lately. (R. 892.) Dr. Turner noted that Plaintiff exhibited normal judgment and concentration, a normal attention span, and a depressed affect. (R. 895.)

Plaintiff visited Dr. Turner nine more times between November 23, 2010, and March 14, 2011, complaining of anxiety, depression, back pain, tooth pain, and generalized pain. (R. 841-42, 843-44, 851-54, 859-61, 862-65, 867-68, 869-70, 871-72, 873-77.) Plaintiff received torodol injections for back and knee pain eight times between January 26 and March 18, 2011. (R. 839-40. 845-46, 847-48, 849-50, 854-55, 856-57, 858, 866.)

On January 25, 2011, Dr. Turner composed a letter which provided:

> [Plaintiff] is currently under my medical care. She has severe and persistent mental illness and is unable to work. [Plaintiff] has major depression and panic disorder which make it difficult for her to follow through with tasks and would make it impossible for her to reliably be at work everyday and maintain a job. She also has

> chronic back pain and migraine headaches. These issues limit her
> activity and would make it difficult for her to work.

(R. 759.) This letter was addressed "To Whom It May Concern." (R. 759.)

On February 9, 2011, Plaintiff's psychotherapist Ms. Gordon wrote a letter to Plaintiff's counsel. (R. 763.) Ms. Gordon stated Plaintiff's diagnosis was major depressive disorder (recurrent); general anxiety disorder; PTSD; rule out borderline personality disorder; back pain; knee problem; migraine headaches; past history of abusive relationships; and grief and loss issues. (R. 763.) Ms. Gordon stated that Plaintiff had made little progress with her depression and anxiety disorders, progress which was compromised by a recent period of homelessness. (R. 763.) Ms. Gordon wrote a second letter to Plaintiff's counsel on March 2, 2011, addressing specific questions from counsel. (R. 761-62.) She stated that Plaintiff had trouble keeping appointments, had no-showed several times, and was unable to commit to basic treatment goals. (R. 761-62.) Ms. Gordon wrote that Plaintiff did not think that her medication helped with her depression or pain, and that she seemed to visit "mostly when she needs some sort of paperwork done . . . for her monies and for her applications to social security disability." (R. 762.)

Plaintiff was taken to the emergency room on February 16, 2011, after being found unresponsive at a McDonald's restaurant. (R. 797-804.) The next day, she was fully responsive and the hospital discharged her. (R. 798.) One doctor opined that a methadone overdose likely caused her unresponsiveness. (R. 804.)

Dr. Turner completed a functional limitations assessment of Plaintiff on March 21, 2011. (R. 910-15.) Dr. Turner opined that Plaintiff could sit for up to 2 hours in an 8-hour

workday; stand or walk for up to 2 hours in a 8-hour work day; never climb, balance, stoop, or crouch, and bend less than 1/3 of a workday. (R. 910.) Dr. Turner opined that Plaintiff would have little or no difficulty remembering locations and work-like procedures; have little or no difficulty understanding and remembering short, simple instructions; and would occasionally be unable to understand and remember detailed instructions. (R. 911.) Dr. Turner opined that Plaintiff would occasionally be unable to carry out detailed instructions, but would have little or no difficulty carrying out very short and simple instructions. (R. 912.)

Dr. Turner opined that Plaintiff would frequently be unable to maintain attention and concentration for extended periods of time; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychological based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 912.) As evidence, Dr. Turner noted that Plaintiff had difficulty remembering her medical appointments and needed her family to prompt her to get things done. (R. 915.) Dr. Turner opined that Plaintiff would be occasionally unable to respond appropriately to changes in the work setting and accept instructions and respond appropriately to criticism from supervisors, and frequently unable to set realistic goals or make plans independently of others. (R. 913.) Dr. Turner opined that Plaintiff would have little or no difficulty interacting appropriately with the general public; asking simple

questions or requesting assistance; getting along with coworkers or peers without distracting them or exhibiting behavior extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places or using public transportation. (R. 913.) Dr. Turner also opined that Plaintiff had a marked restriction of activities of daily living; extreme difficulties in maintaining social functioning; and extreme deficiencies in maintaining concentration, persistence, or pace. (R. 914)

### D. Physical Capacity Assessments

Dr. Cliff Phibbs reviewed Plaintiff's medical record and assessed her physical residual functional capacity ("RFC") on May 22, 2007. (R. 715-22.) Dr. Phibbs opined that Plaintiff could occasionally lift 20 pounds and frequently lift ten pounds, and that Plaintiff could stand and/or walk for about 6 hours in an 8-hour work day. (R. 716.) Dr. Phibbs also opined that Plaintiff's ability to reach with her left arm would be limited. (R. 718.) Those were the only limitations that Dr. Phibbs believed necessary. (R. 715-22.)

Dr. Gregory Salmi reviewed Plaintiff's records and completed an RFC assessment on June 1, 2009. (R. 469-476.) Dr. Salmi opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, and that Plaintiff could stand and/or walk for about 6 hours in an 8-hour workday. (R. 470.) Dr. Salmi also opined that Plaintiff could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (R. 471.) Dr. Salmi did not opine that any manipulative, environmental, visual, or communicative limitations were necessary. (R. 471-43.) Dr. Salmi noted Plaintiff's diagnosis of disc

herniation and that she displayed tenderness in her lumbar spine area, but also noted that she had presented with only moderate pain with motion and had full range of motion with her hips and knees. (R. 470.)

### E. Administrative Hearing

A hearing before an Administrative Law Judge ("ALJ") occurred on May 11, 2011. (R. 27.) Plaintiff testified about her condition as follows: She cannot keep a job because she gets "too stressed and too depressed" to leave the house. (R. 39.) She gets less-than-full-blown anxiety attacks "a few times a month," (R. 40, 54), and she gets migraines "maybe once a week." (R. 40.) During the hearing, Plaintiff was "[v]iolently rocking back and forth" because "sometimes it help[ed]" with her back pain. (R. 41.) She takes methadone because it "helps with the pain," and she takes Topamax for migraines. (R. 40.) Plaintiff is able to wake up her daughters and help them get ready, prepare lunch for her youngest daughter, and care for her youngest daughter when no one else was around. (R. 42-44.) She watches movies and tries to do crossword puzzles while her daughter plays in the corner. (R. 46.) She testified that she would spend an hour or two every day doing various things. (R. 51.)

Dr. Robinson testified as a vocational expert. (Tr. 56-61.) The ALJ presented Dr. Robinson with three hypotheticals. The first hypothetical assumed an individual of Plaintiff's age, education and work experience who is limited to: light exertional work; occasional climbing of ramps and stairs; occasional balancing; occasional stooping, kneeling, crouching and crawling; simple, routine and repetitive tasks; and brief and superficial contact with the public and with coworkers. (R. 57.) Dr. Robinson testified

that an individual with those limitations could perform work as a garment sorter, a packager, or a cleaner. (R. 58.) Dr. Robinson also testified that a significant number of those jobs existed in the national economy and in the state of Minnesota. (R. 58.)

The ALJ's second hypothetical assumed an individual of Plaintiff's age, education and work experience who is limited to sedentary exertional work; simple, routine and repetitive tasks; and a work environment free of fast-paced production requirements involving only simple work-related decision, with few if any workplace changes. (R. 59.) Dr. Robinson testified that an individual with those limitations could perform work as a sorter, a document preparer, or a machine tender. (R. 59.) Dr. Robinson also testified that a significant number of those jobs existed in the national economy and in the state of Minnesota. (R. 59-60.)

The ALJ's third hypothetical assumed an individual of Plaintiff's age, education and work experience who, due to severe mental impairments, cannot sustain sufficient concentration, persistence of pace to do even simple or routine tasks on a regular and continuing basis for an eight-hour day. (R. 60.) Dr. Robinson testified that an individual with those limitations could not perform any jobs in the national economy. (R. 60.)

### F. ALJ's Decision

On May 23, 2011, the ALJ issued a decision denying Plaintiff's claim. (R. 6.) In the decision, the ALJ found as follows: Plaintiff had not engaged in substantial gainful activity since October 24, 2008. (R. 11.) Plaintiff has the following severe impairments: herniated disc at L5-S1; major depressive disorder, severe, with psychotic features; a history of opioid and marijuana dependency; posttraumatic stress disorder; borderline

personality disorder; obesity; and frequent headaches. (R. 11.) Plaintiff dos not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 11.) Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b), except that she can only occasionally climb ramps and stairs; occasionally climb ladders, ropes and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl; and she is limited to simple routine, repetitive tasks, and limited to brief and superficial contact with the public and co-workers. (R. 13.)

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible" to the extent they were inconsistent with the ALJ's functional capacity assessment. (R. 13.) The ALJ found Plaintiff not to be fully credible. (R. 17.) The ALJ determined that Plaintiff's testimony of extreme limitations was not supported by the objective medical evidence. (R. 17.) The ALJ found the opinion of Dr. Gregory Salmi, M.D., that Plaintiff "was capable of performing a full range of light work, but she was limited to occasional climbing of ramps and stairs, occasional climbing of ladders, ropes, and scaffolds, and occasional balancing stooping, kneeling, crouching and crawling" to be entitled to great weight because it was consistent with the physical evidence. (R. 16-17.) The ALJ found the opinion of Plaintiff's primary care physician, Dr. Lorraine Turner, M.D., to be "entitled to little weight because it [was] not supported by objective medical evidence and . . . seem[ed] to be based on the subjective complaints of" Plaintiff.

(R. 17.) The ALJ found the opinion of Dr. Hoffman to be entitled to some weight, "although [the ALJ was] not persuaded that [Plaintiff] cannot tolerate an ordinary level of routine work stress." (R. 15.) The ALJ found the opinion of Ms. Gordon to be entitled to little weight because "the ultimate question of disability is reserved to the Commissioner." (R. 16.) The ALJ found Dr. Kuhlman's opinion to be entitled to great weight "since it is most consistent with the medical evidence." (R. 16.) The ALJ ultimately found Plaintiff not to be disabled and denied her claim.

## III. ANALYSIS

### A. Standard of Review

Review by this Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support

the opposite finding). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf*, 3 F.3d at 1213. Rather, the Court "must consider both evidence that supports and evidence that detracts from the [ALJ's] decision" and "may not reverse merely because substantial evidence exists for the opposite decision." *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996). If it is possible to reach two inconsistent positions from the evidence, then the court must affirm the ALJ's decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992).

To be entitled to SSI, a claimant must be disabled. 42 U.S.C. § 1382(a)(1). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 416.920(a)(4). The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. § 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

### B. Arguments and Analysis

Plaintiff disputes the ALJ's determination, arguing (1) the ALJ did not give appropriate weight to the opinions of Dr. Turner, Dr. Hoffman, and Dr. Kuhlman when making the RFC finding; and (2) as a result of the ALJ's flawed RFC finding, the ALJ posed an inaccurate hypothetical question to the vocational expert.

#### 1. ALJ's Weight Determinations

##### a. Dr. Turner

Plaintiff argues that because Dr. Turner was Plaintiff's treating physician, her opinion should be granted greater weight. "Medical opinions of a treating physician are normally accorded substantial weight." *Dixon v. Barnhart*, 353 F.3d 602, 606 (8th Cir. 2003) (citing *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)). "Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole." *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996) (internal quotations and citations omitted). Where the treating physician's opinions are inconsistent, an ALJ can properly accord them less deference. *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995); *cf. Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996) (in ERISA disability cases, a doctor offering inconsistent opinions should be afforded less deference).

The ALJ determined that Dr. Turner's opinion that Plaintiff is disabled was entitled to little weight because "it is not supported by the objective medical evidence but rather appears to be based on the claimant's subjective complaints." R. 16. As the ALJ explained, an MRI taken of Plaintiff's spine in January 2007 showed mild degenerative

disc disease that had not significantly changed since 2004. Dr. Turner's examination reports consistently classified the objective manifestations Plaintiff's back condition as mild or moderate. *See* R. 413 (noting lumbar spine tenderness, moderate pain with motion, and no cervical spine tenderness); R. 432-35 (noting spasm in lumbar spine, but mild pain with motion); R. 494-97 (noting spasm in lumbar spine, but mild pain with motion); R. 885-86 (noting severe pain with motion of lumbar spine, mildly reduced range of motion, and intact balance and gait).

The ALJ also noted that Dr. Turner's opinions regarding Plaintiff's "extreme mental health limitations" are not supported by evidence from any psychiatrist. R. 18. Plaintiff argues that the ALJ erred by failing to give great weight to Dr. Turner's opinion that Plaintiff's mental impairments were severe enough to meet or medically equal a listed impairment. Pl.'s Mem. in Supp. at 35. "It is the ALJ's function," however, "to resolve conflicts among the opinions of various treating and examining physicians." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). Dr. Turner is not a mental health professional, and the ALJ could reasonably afford her opinions regarding Plaintiff's mental health less weight. *See Turley v. Sullivan*, 939 F.2d 524, 527 (8th Cir. 1991) (determining that "the treating physician's opinion is subject to criticism as being outside his or her area of expertise"); *see also Dixon*, 353 F.3d at 606 (where the treating physician was "not a psychiatric specialist," ALJ could reasonably discredit treating physician's opinion about the plaintiff's mental health); 20 C.F.R. § 416.927(c)(2)(ii) (providing that less weight is given to a treating source's opinions that are outside the treating source's area of expertise). Both Dr. Kuhlman and Dr. Cools reviewed Plaintiff's

records and opined that her mental impairments did not meet or medically equal a listed impairment. Dr. Johnson's impression was that Plaintiff's incapacitation was of minimal nature other than her subjective complaints of depression. Dr. Turner herself agreed with Dr. Johnson, opining that Plaintiff would have little or no difficulty remembering locations and work-like procedures; understanding and remembering short, simple instructions; and carrying out very short and simple instructions. This conflict of opinions is exactly the kind of conflict among experts that the ALJ must resolve. And in this case, the ALJ resolved the conflict against Plaintiff and concluded that her impairments did not meet or medically equal a listed impairment, an issue reserved for the Commissioner pursuant to 20 C.F.R. § 416.927(d)(2).

Dr. Turner opined that Plaintiff can sit up to 2 hours in an 8-hour workday, stand and/or walk up to 2 hours in an 8-hour workday, can lift up to 25 pounds less than 1/3 of the workday, can never balance, stoop or crouch, and bending should be limited to no more than 1/3 of the workday. This opinion is inconsistent with medical evidence showing that Plaintiff's balance was intact and that Dr. Turner recommended Plaintiff start a physical exercise regimen. *See Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). Moreover, Plaintiff reported that she had walked up to an hour and a half at a time with her children. The ALJ could reasonably determine that Dr. Turner's opinion was inconsistent with the objective medical evidence, Plaintiff's reported activities of her daily living, and Dr. Turner's own recommendation that Plaintiff join a walking program and begin exercising.

The ALJ considered the record as a whole and found Dr. Turner's conclusions to be inconsistent with the record. The ALJ then concluded that Dr. Turner's opinion was entitled to lesser weight because it "is not supported by objective medical evidence" and "based on the subjective complaints of [Plaintiff]," which he found less than fully credible. The Court finds that substantial evidence supports the ALJ's decision to afford little weight to Dr. Turner's opinion.

### b. Dr. Hoffman

Plaintiff argues that the ALJ substituted his own opinion for that of Dr. Hoffman without good reason. Dr. Hoffman conducted a psychological evaluation of Plaintiff and opined that Plaintiff "would tolerate little stress in an entry-level workplace." R. 449. The Court determines that to the extent Dr. Hoffman opined that Plaintiff could not handle the ordinary stress of entry-level employment, substantial evidence supports the ALJ's decision not to adopt Dr. Hoffman's opinion. First, nothing in his opinion indicates that Dr. Hoffman meant that Plaintiff could not handle the ordinary stress of an entry-level workplace. Indeed, Dr. Hoffman classified Plaintiff's depression as "regular" and "low grade." R. 449. He also opined that Plaintiff "carries out a limited number of tasks with mild persistence at an intermittent pace," "can concentrate on and understand ordinary instructions," and "would probably respond satisfactorily to co-workers and supervisors unless very depressed." R. 449. In light of these statements, the ALJ could reasonably interpret Dr. Hoffman's opinion to mean that Plaintiff could tolerate the normal stresses of an entry-level workplace. Second, even assuming arguendo that Dr. Hoffman meant to convey that Plaintiff could not tolerate ordinary stresses of an entry-level workplace,

substantial evidence exists to support the ALJ's determination. Both Dr. Kuhlman and Dr. Cools opined that Plaintiff could tolerate ordinary stresses of routine work settings. R. 479, 534. Plaintiff's record also showed that she was able to parent two children with some success. Accordingly, the Court determines that substantial evidence supports the ALJ's decision not to adopt fully Dr. Hoffman's opinion.

### c. Dr. Kuhlman

Dr. Kuhlman reviewed Plaintiff's file and opined that Plaintiff's ability to remember locations and work-like procedures and her ability to understand and remember very short and simple instructions were not significantly limited, but her ability to understand and remember detailed instructions was moderately limited. R. 477. Plaintiff argues that the ALJ should have given no weight to Dr. Kuhlman's opinion because rather than determining Plaintiff's RFC at the time of his assessment, he projected what he thought Plaintiff's RFC would be almost five months in the future. *See* R. 479.

Although he opines what Plaintiff would be able to do four and a half months in the future, Dr. Kuhlman's notes and observations address Plaintiff's contemporaneous statements and medical history up to the date of his consultation with her. Dr. Kuhlman noted that a functional assessment found moderate problems in all areas but severe-to-extreme problems in only one area. He noted that Plaintiff indicated that she had no problems getting along with others or following instructions. Plaintiff told Dr. Kuhlman that she is able to go out alone and capable of managing her own finances. Dr. Kuhlman also noted that Plaintiff's medical record showed improvement over time and that she

was not diagnosed with a serious and persistent mental illness. Although he opined as to what Plaintiff's RFC would be a few months into the future, Dr. Kuhlman's analysis and comments addressed Plaintiff's abilities at the time of his assessment, and his analysis and comments are consistent with the medical evidence as a whole. Accordingly, the ALJ did not err in giving Dr. Kuhlman's opinion great weight.

## 2. Substantial Evidence Supports the ALJ's RFC Determination

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence. To support this argument, Plaintiff asserts that the ALJ failed to give appropriate weight to treating-source opinions; the ALJ's findings regarding Plaintiff's RFC and credibility are not supported by the record as a whole; and the ALJ's question to the vocational expert was not substantial evidence to support denying Plaintiff's claim.

As set forth above, the ALJ's decisions regarding how much weight to give the treating-source opinions of Dr. Turner and Dr. Hoffman were supported by substantial evidence.

The ALJ found that the opinions of Dr. Kuhlman and Dr. Salmi and the lack of objective medical evidence to the contrary supported his RFC determination. Dr. Kuhlman opined that Plaintiff's ability to remember locations and work-like procedures and her ability to understand and remember very short and simple instructions were not significantly limited, but her ability to understand and remember detailed instructions was moderately limited. Dr. Salmi opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and that Plaintiff could stand and/or walk for about 6 hours in

an 8-hour workday. He also opined that Plaintiff did not require any manipulative, environmental, visual, or communicative limitations. The objective medical evidence showed that Plaintiff suffered from frequent headaches, chronic back pain, and mild degenerative disc disease. Both doctors explicitly discussed the medical evidence on which they based their opinions. Moreover, Dr. Shipley also noted that Plaintiff's attention, concentration and cognition were intact, and that she was able to perform many tasks without difficulty, including caring for her children, using public transportation, cooking, doing laundry, shopping, paying bills, managing her own finances, talking to friends, and focusing on TV shows. Dr. Shipley also opined that Plaintiff had the cognitive abilities and concentration necessary to complete tasks, could make work-related decisions, remember locations and work-like procedures, and maintain a schedule. Viewing the record as a whole, the Court determines that substantial evidence supports the ALJ's findings regarding Plaintiff's RFC.

The ALJ also found that Plaintiff's subjective complaints were not entirely credible. "The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence." *Gwalthey v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (citation omitted). When evaluating the credibility of a claimant's subjective complaints, the ALJ

> must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by the third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of

31

> medication; and (5) functional restrictions. The [ALJ] is not
> free to accept or reject the claimant's subjective complaints
> *solely* on the basis of personal observations. Subjective
> complaints may be discounted if there are inconsistencies in
> the evidence as a whole.

*Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

The record contains substantial evidence that supports the ALJ's credibility determination. Despite testifying that she essentially spends the entire day lying on a mattress in her living room, Plaintiff reported being able to walk up to an hour and a half and caring for two of her children, including a four-year-old. One of Plaintiff's treating physicians remarked that the only time Plaintiff appeared for appointments was when she needed documentation to apply for social security. Based on the record as a whole, the Court determines that the ALJ's finding is supported by substantial evidence in the record. Accordingly, "[t]he fact that the ALJ omitted from his hypothetical question those aspects of [Plaintiff's] subjective complaints that the ALJ considered non-credible does not render the [hypothetical] faulty." *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004).

An ALJ's hypothetical question is sufficient if it "sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Davis v. Apfel*, 239, F.3d 962, 966 (8th Cir. 2001). The ALJ asked the vocational expert hypothetical questions that appropriately accounted for the limitations supported by the evidentiary record. *Finch v. Astrue*, 547 F.3d 933, 937 (8th Cir. 2008). Dr. Kuhlman opined that despite Plaintiff's mild depression, she had the mental capacity to concentrate on, understand, and remember routine, repetitive tasks comprising 3-4 steps of

uncomplicated instructions. Dr. Cools opined that Plaintiff would be able to learn 3-4 step tasks and to concentrate sufficiently to perform simple, routine tasks on a sustained basis. He also opined that Plaintiff could operate under ordinary stress in a work-like setting. Viewing the record as a whole, substantial evidence supports the ALJ's RFC determination.

The ALJ considered the record as a whole and found that Plaintiff was capable of performing light work as defined in 20 C.F.R. § 426.967(b) with a few restrictions. The record contains sufficient evidence to support this determination. The physical RFC assessments determined that Plaintiff could perform a limited range of work, and her medical records show that she was improving. Plaintiff's symptoms of depression had become less serious, she had lost 61 pounds in one year, and she had increased her daily activity. Both psychologists opined that Plaintiff could concentrate on, understand, and remember routine, repetitive 3-4 step, uncomplicated instructions. Whether or not other evidence on the record could support a different finding, the ALJ's RFC determination and his third hypothetical question are both supported by substantial evidence.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Docket No. 12) be **DENIED**, Defendant's Motion for Summary Judgment (Docket No. 15) be **GRANTED**, and this action be **DISMISSED WITH PREJUDICE**.


Date:  August 5, 2013                                s/ Tony N. Leung
                                                  Tony N. Leung
                                                  United States Magistrate Judge
                                                  District of Minnesota

                                                  *Miller v. Colvin*
                                                  File No. 12-cv-1308 (PJS/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **August 20, 2013.**